Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHAD STRAPP, derivatively on behalf of SEMTECH CORPORATION, | |
| Plaintiff, | Case No.: |
| v. | |
| HONG Q. HOU, MARK LIN, MARTIN S.J. BURVILL, RODOLPHO C. CARDENUTO, GREGORY M. FISCHER, SAAR GILLAI, ROCKELL N. HANKIN, PAULA LUPRIORE, JULIE G. RUEHL, and PAUL V. WALSH, JR., | **DEMAND FOR JURY TRIAL** |
| Defendants, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| and | |
| SEMTECH CORPORATION, | |
| Nominal Defendant. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTRODUCTION

Plaintiff Chad Strapp ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Semtech Corporation ("Semtech" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Hong Q. Hou ("Hou"), Mark Lin ("Lin"), Martin S.J. Burvill ("Burvill"), Rodolpho C. Cardenuto ("Cardenuto"), Gregory M. Fischer ("Fischer"), Saar Gillai ("Gillai"), Rockell N. Hankin ("Hankin"), Paula LuPriore ("LuPriore"), Julie G. Ruehl ("Ruehl"), and Paul V. Walsh, Jr. ("Walsh") (collectively, the "Individual Defendants," and together with Semtech, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Semtech, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, and against Defendants Hou and Lin for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Semtech, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from August 27, 2024 through February 7, 2025, inclusive (the "Relevant Period").

2.    Semtech is a Delaware-incorporated company headquartered in Camarillo, California that purports to be "a leading provider of high-performance semiconductor,

Verified Shareholder Derivative Complaint

Internet of Things ('IoT') systems and cloud connectivity service solutions and were incorporated in Delaware in 1960."[1] The Company represents in its SEC filings that it "design[s], develop[s], manufacture[s] and market[s] a diverse portfolio of products for commercial applications, addressing the global infrastructure, high-end consumer and industrial end markets."[2] One of the Company's products is CopperEdge, a signal integrity technology mainly employed in data centers to broaden the reach and performance of copper interconnects.

3.    The Relevant Period began on August 27, 2024 when the Company published a press release announcing its financial results for the second quarter of 2024 ended July 28, 2024. The same day, the Company also hosted an earnings call with analysts and investors to discuss the results. During the call, Defendant Hou stated the following, in relevant part:

> For our 200G CopperEdge linear re-drivers, **_we have received the purchase orders from ACC cable manufacturers and expect the shipments to start in our fiscal third quarter in limited quantities, a nominal ramp in the fourth quarter and acceleration in the next fiscal year._**

4.    Throughout the Relevant Period, the Individual Defendants repeatedly misled investors regarding the Company's partnership with NVIDIA and the net sales it had achieved from its CopperEdge products. These statements failed to disclose, _inter alia_, that the Company's CopperEdge products suffered from heating issues, which eventually led NVIDIA to halt its purchases and develop its own new processing unit.

5.    The truth began to emerge on February 7, 2025 when Robert W. Baird & Co lowered its price target on Company stock from $80 to $60, explaining that there had been

---

[1]

https://www.sec.gov/ix?doc=/Archives/edgar/data/0000088941/000008894125000068/smtc-20250126.htm#if5ec4748fb2847f18a466e76f8e5cab8_22

[2] _Id._

a slower-than-expected uptake of the Company's active copper cables, which offer widened reach to provide for high-volume switch-to-server connections.

6.    On this news, the Company's common stock fell $5.99 per share, from a closing price of $60.50 per share on February 6, 2025 to close at $54.51 per share on February 7, 2025.

7.    The truth fully emerged on February 7, 2025 when the Company filed a current report on Form 8-K with the SEC announcing, *inter alia*, that, for the 2026 fiscal year, net sales from Semtech's CopperEdge products used in active copper cables were "***expected to be lower than the Company's previously disclosed floor case estimate of $50 million due to rack architectural changes, with no expected ramp-up over the course of fiscal year 2026***."[3] In addition, Semtech disclosed that the "revised estimates are based on recent feedback from a server rack customer and correlated to discussions with end users of the server rack platform." That customer was supposedly NVIDIA.

8.    On this news, the Company's stock price fell $16.91, from a closing price of $54.51 per share on February 7, 2025 to close at $37.60 per share on February 10, 2025.

9.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was experiencing a reduction in sales for its CopperEdge products as a result of heating issues associated therewith; (2) as a result of the heating issues associated with CopperEdge, NVIDIA stopped purchasing CopperEdge products from Semtech and developed its own new processing unit instead; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the

---

[3] All emphasis has been added unless otherwise noted herein.

Verified Shareholder Derivative Complaint

Individual Defendants' statements were materially false and misleading and/or lacked a rational basis at all relevant times.

10. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while, at the same time, two of the Individual Defendants made insider sales while in possession of material nonpublic information, netting combined total proceeds of $709,149.

11. Additionally, in breach of their fiduciary duties, the Individual Defendants, during the Relevant Period, caused the Company to fail to maintain adequate internal controls.

12. In light of the Individual Defendants' misconduct—which has subjected the Company, its President and Chief Executive Officer ("CEO"), and its Executive Vice President ("EVP") and Chief Financial Officer ("CFO") to three federal securities fraud class action lawsuits pending in the United States District Court for the Central District of California (the "Securities Class Actions"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

13. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Hou's and Defendant Lin's liability in the Securities Class Action, and of their not being disinterested

Verified Shareholder Derivative Complaint

and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

16.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.    Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

19.    Plaintiff is a current shareholder of Semtech. Plaintiff has continuously held Semtech common stock at all relevant times.

### Nominal Defendant Semtech

20.    Semtech is a Delaware corporation with principal executive offices at 200 Flynn Road, Camarillo, CA 93012. Semtech's common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "SMTC."

### Defendant Hou

Verified Shareholder Derivative Complaint

21.     Defendant Hou has served as President and CEO of the Company since June 2024 and as a Company director since July 2023.

22.     The Schedule 14A the Company filed with the SEC on April 24, 2025 (the "2025 Proxy Statement") stated the following about Defendant Hou:

Dr. Hou has served as President and Chief Executive Officer of the Company ("CEO") since June 2024 and as a member of the Board since July 2023. Dr. Hou is an accomplished multinational technology executive, recognized as a global enterprise leader with a strong technical and business transformation record in dynamic ultra-competitive markets.

From February 2023 to June 2024, Dr. Hou served as President of the Semiconductor Group at Brooks Automation, Inc., a leading provider of automated wafer handling and contamination control solutions for the semiconductor manufacturing industry. From August 2018 to February 2023, Dr. Hou was Corporate Vice President and General Manager of the cloud networking group of Intel Corporation, a public company, with full P&L responsibility for a group delivering leadership hardware, software, and system products and technologies, including Ethernet controllers and NICs, infrastructure processor units, Ethernet switches, and silicon photonics optical transceivers. Prior to that, Dr. Hou was Executive Vice President and Chief Technical Officer of Fabrinet, Chief Operating Officer at AXT, Inc., and President and Chief Executive Officer, and board member of EMCORE Corporation, all of which are public companies.

**Qualifications:** Dr. Hou's qualifications to serve as a member of the Board include his extensive experience as an accomplished multinational technology executive in leading global enterprises and winning with complex products in dynamic ultra-competitive markets. Dr. Hou's current position as our President and CEO also brings to the Board knowledge of the day-to-day operations of the Company, which provides invaluable insight to our Board as it reviews the Company's strategic and financial plans.

### Defendant Lin

23.     Defendant Lin has served as the Company's EVP and CFO since October 2023.

Verified Shareholder Derivative Complaint

24.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Lin made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 2025-1-29 | 2,990 | $60.24 | $180,105 |
| 2024-12-17 | 6,114 | $66.16 | $404,508 |

Thus, in total, before the fraud was exposed, he sold 9,104 shares of Company stock on inside information, for which he received approximately $584,613 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

25.     The 2025 Proxy Statement stated the following about Defendant Lin:

Mr. Lin joined the Company in October 2023 as Executive Vice President and CFO. Before joining Semtech, Mr. Lin served as Vice President and Corporate Controller of MKS Instruments, Inc., a global provider of foundational technology solutions to leading edge semiconductor manufacturing, electronics and packaging, and specialty industrial applications from November 2019 to October 2023. Previously, Mr. Lin was with Microsemi Corporation from June 2005 until July 2019, holding various accounting and finance roles, including Vice President, Finance and Corporate Controller, a position he assumed in 2014.

**Defendant Burvill**

26.     Defendant Burvill has served as a Company director since October 2020. He also serves as Chair of the Human Capital and Compensation Committee and as a member of the Nominating and Governance Committee.

27.     The 2025 Proxy Statement stated the following about Defendant Burvill:

Mr. Burvill held a variety of positions at Verizon Communications Inc. from 2006 through his retirement in 2019. From 2016 through 2019, Mr. Burvill served as President of Business Markets, which provides fixed and mobile

(4G/5G) networking, IoT, security, and cloud/IT services to U.S. small and medium sized businesses and state and local governments. From 2012 through 2016, Mr. Burvill served as Senior Vice President Global Operations of Verizon Enterprise. Prior to 2012, he was Vice President, Europe, and Vice President Global Solutions of Verizon Enterprise. Mr. Burvill also previously held executive positions at MCI Communications Corp., Nexagent Ltd., Internap Holding LLC, Racal Telecom Ltd., British Telecom plc and S.I.T.A. SA.

Mr. Burvill worked in numerous countries around the world, including the United States, and in Europe, Asia, and South America. He serves on multiple private and institutional boards, including serving as Independent Director of Nexar Inc., a leading vision/AI data services based provider of solutions for optimizing commercial and leisure based road transportation, since 2022. Mr. Burvill also serves on the Dean's Advisory Board and the Institute for International Economic Policy Executive Circle — both at the Elliot School of International Affairs at George Washington University.

**Qualifications:** Mr. Burvill's qualifications to serve as a member of the Board include his extensive expertise in general management, business transformation, network services, digital transformation, cloud-based services, cybersecurity, and a diverse set of other corporate functions. He is highly experienced in serving the needs of regulated and non-regulated industries, and national / local governments. Mr. Burvill has extensive leadership and transformation skills including: P&L ownership, sales, marketing, operations, product management, digital transformation, cloud-based services, cybersecurity, mergers and acquisitions, and a diverse set of other corporate functions.

### Defendant Cardenuto

28.    Defendant Cardenuto has served as a Company director since September 2018. He also serves as a member of the Audit Committee.

29.    The 2025 Proxy Statement stated the following about Defendant Cardenuto:

Mr. Cardenuto has served as Chief Executive Officer of SEIDOR North America, a global technology consulting firm, since November 2023. Prior to that, he served as President, Applications Group of Vonage Holdings Corp., a global business cloud communications company, from December 2019 to May 2023. From May 2023 to December 2023, Mr. Cardenuto served as an

Verified Shareholder Derivative Complaint

advisor and board member for certain private companies. Senior Vice President, Sales of Magic Leap, Inc., a private company focused on augmented reality products, from January 2019 until November 2019, President of SAP Americas, Inc. Global Partner Operations organization from 2014 to December 2018. Mr. Cardenuto joined SAP in 2008 as President of SAP Latin America and the Caribbean and also served as President of SAP Americas in 2013. Mr. Cardenuto held executive positions at Hewlett-Packard Company from 2001 to 2007, and prior to 2001, he held executive positions at Vesper Telecomunicações, Nextel Comunicações, and Hewlett-Packard Brasil Ltda.

Mr. Cardenuto has served as Chairman of the Board of MIGNOW, a private company specializing in SAP migration software, since February 2020.

**Qualifications:** Mr. Cardenuto's qualifications to serve as a member of the Board include his more than 25 years of extensive and high level experience in the technology industry as well as his experience with global operations.

**Defendant Fischer**

30.     Defendant Fischer has served as a Company director since April 2023. He also serves as a member of the Human Capital and Compensation Committee, the Nominating and Governance Committee, and the Technology and Strategy Committee.

31.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Fischer made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 2024-12-10 | 1,888 | $63.31 | $119,536 |

Thus, in total, before the fraud was exposed, he sold 1,888 shares of Company stock on inside information, for which he received approximately $119,536 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

32.    The 2025 Proxy Statement stated the following about Defendant Fischer:

Mr. Fischer most recently served as Senior Vice President and General
Manager at Broadcom Inc., a public company and an American designer,
developer, manufacturer, and global supplier of a wide range of
semiconductor and infrastructure software products, from 2014 to May 2021,
and as Vice President and General Manager of the Carrier Access Business
from 2004 to 2014. Previously, Mr. Fischer served as Vice President and
General Manager of the Video Products Business Unit at Conexant Systems,
Inc., an American-based software developer and fabless semiconductor
company, from 2002 to 2004, and as Director of Product Marketing and
Business Development, from 1997 to 2002. Earlier in his career, he served as
Manager of Corporate Business Development at Rockwell International
Corporation (n/k/a Rockwell Automation, Inc.), a major American
manufacturing conglomerate involved in aircraft, the space industry, defense
and commercial electronics, components in the automotive industry, printing
presses, avionics and industrial products, from 1994 to 1997, and served in
several design engineering and program management positions at Rockwell
Collins Avionics Co. (before being purchased by Raytheon Technologies
Corporation), an avionics technology company, from 1985 to 1994.

Mr. Fischer has served as an independent advisor to Gerson Lehrman Group,
Inc., a professional services firm, since December 2021, and AlphaSights
Ltd., an information services company specializing in connecting clients with
experts, since December 2021. Mr. Fischer has served on the advisory board
of Syntiant Corp., an edge-AI neural processor and modeling company since
May 2023 and has served as President at Fischer Family Community
Outreach, a foundation dedicated to feeding, clothing and housing indigent
residents of San Diego County, since 2017.

**Qualifications:** Mr. Fischer's qualifications to serve as a member of the
Board include 30 years of experience operating and scaling wireline and
wireless semiconductor businesses through multiple economic and
technology cycles. Mr. Fischer has also led M&A and post-merger strategies,
focusing on product line integration and operating expense management to
achieve profitable franchise growth. Mr. Fischer was initially appointed to the
Board pursuant to a cooperation agreement with a stockholder.

**<u>Defendant Gillai</u>**

33.     Defendant Gillai has served as a Company director since September 2018. He also serves as Chair of the Technology and Strategy Committee and as a member of the Human Capital and Compensation Committee and the Nominating and Governance Committee.

34.     The 2025 Proxy Statement states the following about Defendant Gillai:

Mr. Gillai has served as an independent board director and Chief Executive Officer advisor to multiple start-ups from January 2020. He has been an executive mentor at The Exco Group since October 2020. Previously, Mr. Gillai served as Chief Executive Officer and Director of Teridion Technologies Ltd, a cloud-based networking company, from October 2017 to December 2019. He also served as the Senior Vice President and General Manager of Hewlett Packard Enterprise Co.'s Communications Solutions Business from October 2014 to October 2016. Prior to that, Mr. Gillai was the Senior Vice President, General Manager and Chief Operating Officer of HP Cloud from November 2012 to October 2014. Other previously held executive positions include positions at 3Com Corp., Enfora Inc., Tropos Networks Inc., and Cisco Systems, Inc.

Mr. Gillai has been the Chairman of the Board of Liquid Instruments, Pty Ltd., a private company focused on next generation test equipment, since March 2021. He previously served as a director of Xilinx, Inc., a public company and the leading provider of All Programmable FPGAs, SoCs, MPSoCs and 3D ICs, from May 2016 to February 2022 (acquired by Advanced Micro Devices, Inc.). He also served as a director of SpaceIQ LLC, a private company and provider of smart IWMS/CAFM facility management software from July 2017 to August 2019 (acquired by WeWork Inc.).

**Qualifications:** Mr. Gillai's qualifications to serve as a member of the Board include his senior executive and board experience in both startups and public companies and his over thirty years of experience in the technology industry.

## Defendant Hankin

35.     Defendant Hankin served as a Company director from 1988 and as Chairman of the Board from 2006 until resigning from the Company in November 2024.

36.     The Schedule 14A the Company filed with the SEC on April 26, 2024 (the

"2024 Proxy Statement") stated the following about Defendant Hankin:

> Private investor from January 2006 to date. Chief Executive Officer and
> Principal, Hankin & Co., a diversified business advisory and investment
> banking firm from June 1986 through December 2005. Chairman of the Board
> of the Kavli Foundation.

> Mr. Hankin has spoken on corporate governance issues including at the Duke
> Capital Markets Director's Education Institute, UCLA's Director
> Certification Program, the University of Maryland Directors' Institute and
> various other corporate governance programs.

> **Qualifications:** Mr. Hankin's qualifications to serve as a member of the
> Board include his 33 years of experience as Director of the Company which
> we believe provides our Board with specific expertise and insight into our
> business, his experience as a former chairman or a former director of other
> public and private companies and his advisory and corporate governance
> expertise.

## Defendant LuPriore

37.    Defendant LuPriore has served as a Company director since October 2020.
She also serves as a member of the Audit Committee and the Human Capital and
Compensation Committee.

38.    The 2025 Proxy Statement stated the following about Defendant LuPriore:

> Ms. LuPriore is a seasoned operating executive in global technology
> businesses. Most recently, she served as Chief Executive Officer and Co-
> founder of Wujitech, Inc., a private cloud-based company delivering bio-
> analytic software solutions, from 2010 to 2023 and currently remains on its
> board. From 2002 through 2010, Ms. LuPriore served in various positions at
> Asyst Technologies, Inc., a public technology and manufacturing company
> providing robotic automation solutions for the semiconductor equipment
> industry, including as Executive Vice President and Chief Operating Officer,
> as well as Interim Chief Executive Officer. Ms. LuPriore began her career as
> a software engineer at IBM Corp. and spent 23 years leading various product
> organizations across engineering, strategy, marketing, and technical sales and
> services, serving in various senior executive roles including as Vice President
> of IBM's Storage Networking Division targeting the Network Attached
> Storage market.

Ms. LuPriore has served on the board of directors of Saguaro Technology, Inc., a strategic software development company that specializes in cloud computing, data analytics, IoT, and embedded systems, since 2024. She has also served on the board of directors of Wujitech, Inc., a private company, since 2011. In 2015, she served as a Director of PCS Edventures Inc., a publicly traded technology company that designs and delivers education products and services for the science, technology, engineering, and mathematics (STEM) market, where she served on the audit and compensation committees.

**Qualifications:** Ms. LuPriore's qualifications to serve as a member of the Board include her extensive operating experience as a senior level executive spanning information technology enterprise software and hardware systems, semiconductor, networking, and infrastructure markets, with broad expertise in data center, cloud computing, and technology consulting services across various industries in domestic and international markets. Her business experience as a corporate executive has established her deep understanding of the opportunities and challenges in technology businesses.

### **Defendant Ruehl**

39.    Defendant Ruehl has served as a Company director since December 2023. She also serves as a member of the Audit Committee.

40.    The 2025 Proxy Statement stated the following about Defendant Ruehl:

Ms. Ruehl served as Chief Financial Officer of Fly Leasing Limited, a global commercial aircraft leasing company, from August 2017 to August 2021 (formerly NYSE:FLY), Vice President and Chief Accounting Officer for Big Heart Pet Brands (and its predecessor, Del Monte Corporation), a producer, distributor and marketer of premium quality, branded pet products and food products in the U.S., from November 2011 to December 2015, and in senior financial positions with Del Monte Corporation and its parent, Del Monte Foods Company from May 2005 to October 2011. Additionally, Ms. Ruehl served in a senior financial position with Sanmina Corporation, a global provider of electronics manufacturing services from 2002 to 2005. Prior to that, Ms. Ruehl was an Audit Partner at Arthur Andersen LLP.

Ms. Ruehl has served as an independent director for Zevia PBC, a publicly traded "Certified B Corporation," offering a broad portfolio of zero sugar, zero calorie, naturally sweetened beverages, since March 2021. Her role on

its board of directors includes serving as chair of the audit committee and a member of the compensation committee. Ms. Ruehl previously served as a director and chair of the audit committee and member of the compensation committee of Wizeline, Inc., a global technology services company, from November 2021 to January 2024. She also served as a director and chair of the audit committee of Wine.com, a leading online wine retailer, from March 2022 to November 2023.

**Qualifications:** Ms. Ruehl's qualifications to serve as a member of the Board include her extensive 25+ years of finance senior executive leadership experience in a wide range of public and private equity backed companies. Ms. Ruehl was initially appointed to the Board pursuant to a cooperation agreement with a stockholder

**Defendant Walsh**

41.     Defendant Walsh has served as a Company director since April 2023. He also serves as Chair of the Audit Committee and as a member of the Nominating and Governance Committee and the Technology and Strategy Committee.

42.     The 2025 Proxy Statement stated the following about Defendant Walsh:

Prior to retiring in February 2022, Mr. Walsh served as Chief Financial Officer, Senior Vice President and Treasurer, at Allegro MicroSystems, Inc., a publicly traded global semiconductor company that designs and manufactures advanced sensor and power management integrated circuits for the automotive and industrial end markets, from 2014 to 2022. Prior to joining Allegro, Mr. Walsh served as the Chief Financial Officer and Senior Vice President of Rocket Software, Inc., a global software development firm, from 2013 to 2014. From 2004 to 2013, he served in several financial leadership roles at Silicon Laboratories Inc., a publicly traded global technology company that designs and manufacturers semiconductors, including as: Chief Financial Officer and Senior Vice President from 2011 to 2013 and Chief Accounting Officer and Vice President of Finance from 2006 to 2011, among other roles.

Mr. Walsh currently serves on the board of directors of Kopin Corporation, an electronics manufacturer, and serves as the chair of its audit committee. Mr. Walsh served as an advisor to the board of directors and audit committee of Anokiwave, Inc., a late-stage semiconductor company, from October 2022 to February 2024, where he was also an investor. Anokiwave, Inc. was

acquired by Qorvo, Inc. in February 2024. Additionally, he served on the board of directors of Nitero, Inc., a venture-backed startup semiconductor company, from 2012 to 2015, and Grande Communications Networks, LLC, a broadband communications provider of cable and internet services, from 2008 to 2010, including as chairman of the audit committee.

**Qualifications:** Mr. Walsh's qualifications to serve as a member of the Board include his extensive experience of more than 30 years in the global semiconductor industry, with service as Chief Financial Officer for two public companies in the industry, which we believe provides our Board with valuable executive-level insights and broad and diverse operational industry experience. Mr. Walsh was initially appointed to the Board pursuant to a cooperation agreement with a stockholder.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

43.    By reason of their positions as officers, directors, and/or fiduciaries of Semtech and because of their ability to control the business and corporate affairs of Semtech, the Individual Defendants owed Semtech and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Semtech in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Semtech and its shareholders so as to benefit all shareholders equally.

44.    Each director and officer of the Company owes to Semtech and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

45.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Semtech, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

46.    To discharge their duties, the officers and directors of Semtech were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

Verified Shareholder Derivative Complaint

47.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Semtech, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

48.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

49.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and

directors of Semtech were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Semtech's corporate governance and applicable codes of conduct and/or ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Semtech conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Semtech and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Semtech's operations would comply with all applicable laws and Semtech's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other

financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

50.    Each of the Individual Defendants further owed to Semtech and the shareholders the duty of loyalty requiring that each favor Semtech's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

51.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Semtech and were at all times acting within the course and scope of such agency.

52.    Because of their advisory, executive, managerial, directorial, and controlling positions with Semtech, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

53.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Semtech.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

54.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

55.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual

Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

56.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Semtech was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

57.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

58.     At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Semtech and was at all times acting within the course and scope of such agency.

### SEMTECH'S CODE OF CONDUCT

59.     Semtech's Core Values and Code of Conduct (the "Code of Conduct") states that "[o]ur Core Values and our Code of Conduct apply to all of us in the Company - all

directors, officers, and employees around the world. These guidelines emphasize the importance that the Board of Directors and the Senior Leadership Team place on ethical actions, individual integrity and fair dealing. These are the cornerstones of acceptable business conduct."

60.    In the section "Conflicts of Interest," the Code of Conduct states the following, in relevant part:

> You must avoid any investment, business interest or other association that interferes — or even appears to interfere — with your ability to act in the best interests of the Company. A conflict of interest arises when your judgment in acting for the Company may be influenced by an actual or potential personal benefit of any kind. The personal benefits may be direct or indirect, may or may not be financial in nature, and could exist through family connections, personal associations or otherwise.

61.    In the section "Use of Company Funds, Assets, and Facilities and Corporate Opportunities," the Code of Conduct states:

> You are personally responsible for any Company funds over which you have control, and anyone spending Company money should always be sure the Company receives good value in return. All employees are responsible for the proper use of Semtech's property, information resources, facilities and equipment. Company property is vital to our business, and your vigorous protection of our assets is critical to our long-term success. Use and maintain these assets with the utmost care and respect and help the Company guard against waste and abuse by being alert to opportunities for improving efficiency and quality, while reducing costs. The Company's assets are provided for legitimate business purposes. They should never be sold, loaned or removed from Company property without permission from your supervisor. It is recognized, however, that occasional personal use by employees may be reasonable if it does not adversely affect the interests of the Company. Employees should always consult with their supervisors for appropriate guidance. Employees, officers and directors are prohibited from taking for themselves, personally, opportunities that properly belong to the Company or are discovered through the use of corporate property, information or position without the consent of the Board of Directors. No employee may use corporate property, information or position for improper personal gain. Employees, officers, and directors owe a duty to the Company to advance its

legitimate interests when the opportunity to do so arises.

62.    In the section "Records, Costs and Controls," the Code of Conduct states the following, in relevant part:

Keeping accurate and complete records is essential for the Company to meet its public company financial, legal and management reporting and disclosure obligations. Records must be kept in accordance with accepted accounting rules and controls at all times, and should fully and accurately reflect all business transactions.

All reports, vouchers, bills, payroll and service records, measurement and performance records, expense accounts and other important data must be prepared with care and honesty. Employees are responsible for ensuring that all expenses, payments, financial obligations, and all labor and material costs are properly recorded and charged on the Company's records. No employee should ever, under any circumstances, misrepresent facts or falsify records.

Records containing personal data, including computer data, about employees are confidential. They are to be carefully safeguarded and kept current, relevant and accurate. They should be disclosed only to authorized personnel or in accordance with a lawful process.

If you are aware of an imminent or ongoing investigation, audit or examination initiated by the Company or any government or regulatory agency, you should retain all documents and records in your custody or control relating to the matter under review. Please note that the knowing destruction or deliberate falsification of any document or data in order to impede a governmental or regulatory investigation, audit or examination may be the basis for immediate dismissal and termination of employment and may subject you to civil and criminal proceedings including, without limitation, prosecution for obstruction of justice. If you are not sure that a document can be destroyed, consult the Company's General Counsel for guidance.

63.    Regarding waivers, the Code of Conduct states, in relevant part:

Any waiver of the Code of Conduct for the Company's directors or executive officers may be made only by the Board of Directors and the responsibility for approving such waivers has been delegated to the Audit Committee of the Board of Directors. Any waivers of the Code of Conduct for directors or executive officers will be promptly disclosed to stockholders as required by

law, along with the reasons for the waiver. Waivers for other personnel may only be granted by the Company's President and Chief Executive Officer, or by the Chief Financial Officer, and will be reported to our Audit Committee.

64.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Semtech's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## SEMTECH'S AUDIT COMMITTEE CHARTER

65.     Semtech also maintains an Audit Committee Charter which governs the Audit Committee's roles and responsibilities. The Audit Committee Charter states the following under "Purpose":

As permitted by the Bylaws of Semtech Corporation (the "Company"), the Board of Directors (the "Board") of the Company has established a standing Audit Committee (the "Committee") whose authority and responsibilities are described by this charter (the "Charter"). For purposes of this Charter, the "Auditor" is any independent public accountant registered with the Public Company Accounting Oversight Board (the "PCAOB") and retained by the Company for the purpose of preparing or issuing an audit report on the financial statements of the Company or performing other audit, review or attest services for the Company. The purpose of the Committee is to assist the Board in overseeing: • the accounting and financial reporting processes of the Company; • the Company's internal audit function; • the integrity of the Company's financial statements and systems of internal controls and disclosure controls; • the audits of the Company's financial statements; • the appointment, compensation, retention and work of the Auditor; • the Company's financial risk; • the Company's compliance with legal and regulatory requirements; and • the controls that are in place to ensure

compliance with the Company's Core Values and Code of Conduct (the "Code"); and • to take such other actions within the scope of this Charter as the Committee deems necessary or appropriate. In carrying out its responsibilities, the Committee will maintain and facilitate free and open communication between directors, the Auditor and the financial and executive management of the company.

66.    In a section titled "Authority and Oversight by the Board," the Audit Committee Charter states the following, in relevant part:

1. The Committee derives its authority from the Bylaws of the Company and the authority delegated to it by the Board. The Committee's direct reporting relationship is to the Board. 2. The Committee will regularly report its activities to the full Board. The Committee will perform all duties determined by the Board. 3. The Committee is authorized to have full and unrestricted access to the Auditor, internal auditors, internal and outside counsel, and all personnel, records, operations, properties, and all other information and resources of the Company as required, in its sole discretion, to discharge its duties and responsibilities. The Committee has the authority to direct and supervise an investigation into any matter it deems necessary or appropriate to fulfill its duties. 4. While the Committee has the duties, responsibilities and authority set forth in this Charter, nothing contained herein shall be deemed to impose on the Committee any duty, in the ordinary course, to plan or conduct audits or to make any determination that the Company's financial statements are accurate and in accordance with the generally accepted accounting principles in the United States ("GAAP") and applicable laws and regulations. Such duties are the responsibility of management and the Auditor. In carrying out their duties, members of the Committee shall be entitled to rely on (i) the integrity of those persons within the Company and of the professionals and experts (such as the independent auditors, the internal auditors and outside advisors and experts) from which it receives information, (ii) the accuracy of the financial and other information provided to the Committee by such persons, professionals or experts absent actual knowledge to the contrary (which shall be promptly reported to the Board) and (iii) representations made by management or such professionals or experts.

67.    With respect to the Audit Committee's responsibilities as they relate to "Financial Statements and Control Processes," the Audit Committee Charter states the following, in relevant part:

3. The Committee will review and discuss with management and the Auditor the quarterly unaudited financial statements, including review matters required to be discussed under applicable professional standards, including the quarterly report disclosures under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" and those adopted by the PCAOB. The Committee will discuss with management and the Auditor the Company's earnings releases, as well as financial information and earnings guidance provided to analysts and rating agencies. The Committee's discussion in this regard may be general in nature (i.e. discussion of the types of information to be disclosed and the type of presentation to be made) and need not take place in advance of the issuance of each earnings release or each instance in which the Company may provide earnings guidance. 4. The Committee will consider written reports and oral communications by the Auditor relating to (i) critical accounting policies and practices and such other accounting policies of the Company as are deemed appropriate for review by the Committee prior to the filing of any annual or quarterly financial statements with the SEC or other regulatory body, major issues concerning accounting principles and the presentation of the financial statements, including (a) any significant changes in the Company's selection or application of accounting principles, (b) analyses prepared by management or the Auditor setting forth any significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including with respect to alternative treatments within generally accepted accounting principles for policies and practices related to material items that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the Auditor, and (c) any matters arising from the audit of the Company's financial statements that are deemed to constitute "critical audit matters" as defined by applicable PCAOB auditing standards, other material written communications between the Auditor and management, such as any management letter or schedule of unadjusted differences, and (iv) the effect of regulatory and accounting initiatives and any newly-adopted or proposed changes in accounting principles that would significantly affect the Company or its financial statements, including management's implementation plan and processes to establish and monitor controls and procedures over adoption and transition of such accounting principles as well as off-balance sheet structures on the financial statements of the Company. 5. The Committee will periodically review with management and the Auditor their assessments of the integrity, adequacy and effectiveness of the Company's internal controls and disclosure controls, and the resolution of identified material weaknesses and reportable conditions in such controls, whether prior recommendations

concerning such controls made by the Auditor have been implemented by management, and the adequacy of any disclosures about changes in internal control over financial reporting.

68.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

69.    Semtech is a Delaware-incorporated company headquartered in Camarillo, California that purports to be "a leading provider of high-performance semiconductor, Internet of Things ('IoT') systems and cloud connectivity service solutions and were incorporated in Delaware in 1960."[4] The Company represents in its SEC filings that it "design[s], develop[s], manufacture[s] and market[s] a diverse portfolio of products for commercial applications, addressing the global infrastructure, high-end consumer and industrial end markets."[5] One of the Company's products is CopperEdge, a signal integrity technology mainly employed in data centers to broaden the reach and performance of copper interconnects.

---

[4]

https://www.sec.gov/ix?doc=/Archives/edgar/data/0000088941/000008894125000068/smtc-20250126.htm#if5ec4748fb2847f18a466e76f8e5cab8_22

[5] *Id.*

70.    One of the Company's key developments and promising prospects was its partnership with NVIDIA, which catapulted Semtech into the heart of the AI and high-performance computing markets. Indeed, NVIDIA's Blackwell platform integrated the Company's CopperEdge product into it.

71.    Throughout the Relevant Period, the Individual Defendants repeatedly misled investors regarding the Company's partnership with NVIDIA and the net sales it had achieved from its CopperEdge products. These statements failed to disclose, *inter alia*, that the Company's CopperEdge products suffered from heating issues, which eventually led NVIDIA to halt its purchases and develop its own new processing unit.

**False and Misleading Statements**

***August 27, 2024 Press Release and Earnings Call***

72.    The Relevant Period began on August 27, 2024 when the Company published a press release announcing its financial results for the second quarter of 2024 ended July 28, 2024 ("2Q24"). The same day, the Company also hosted an earnings call with analysts and investors to discuss its 2Q24 results. During the call, Defendant Hou stated the following, in relevant part:

> For our 200G CopperEdge linear re-drivers, ***we have received the purchase orders from ACC cable manufacturers and expect the shipments to start in our fiscal third quarter in limited quantities, a nominal ramp in the fourth quarter and acceleration in the next fiscal year.***

73.    Later during the call, when an analyst inquired about whether the Company was "ramping in line to maybe be a bit ahead of expectations with NVIDIA and Blackwell design," Defendant Hou responded the following, in relevant part:

> So, in Q3, we expected the shipment in limited quantities, not gated by the demand, but there is going to be a cycle time from the fab. We have already anticipated that, and we got the wafer bank and die bank build beforehand but ***the real meaningful ramp is going to be in our Q4, fiscal year Q4 and then throughout the 2026 FY***, and we expect pretty healthy demand based on the current PL1 forecast. On November 25, 2024, Semtech announced results of operations for the third quarter of fiscal 2024 (the three months ended October

27, 2024): (a) issuing a press release with operational and financial results; and (b) holding a conference call with analysts to further discuss financial results, operations and prospects (the 3Q Earnings Call).

***November 25, 2024 Press Release and Earnings Call***

74.    On November 25, 2024, the Company published a press release announcing its financial results for the third quarter of 2024 ended October 27, 2024 ("3Q24"). The same day, the Company also hosted an earnings call with analysts and investors to discuss its 3Q24 results. During the call, Defendant Hou stated the following, in relevant part:

[O]n accelerating growth and driving margin expansion, we have made swift changes to intensify customer engagement with the customers to provide technical and operational solutions. ***And our Q3 results and Q4 outlook demonstrate the effectiveness of these initiatives. We continue to see strong tailwinds of customers and targeted markets are moving toward us.***

We have instituted a disciplined investment plan, leveraging our design competency and incorporating performance objectives from key end customers and meeting their critical business needs. I believe we have achieved multigenerational roadmap alignment with the key customers, and we aspire to become their partner of choice for key technical and product solutions we provide. I expect this initiative will accelerate sustainable market share gain and SAM expansion.

75.    Defendant Hou also stated the following during the call, in relevant part:

There have been multiple reports regarding Blackwell GPU rack designs and timing of volume shipment, which could potentially impact the TAM and timing of ACC market where we provide key enabling IC components. That said, allow me to provide some assurances based on our ecosystem engagement. We have invested time with our customer and end users of the racks over the past few months. ***We reaffirmed our expectation of exceeding the floor case provided a couple quarters ago based on the firsthand information from the ecosystem.***

76.    In addition, when asked by an analyst about the amount of CopperEdge being shipped out and "the bulk of these shipments, is this all to the big AI GPU guy directly," Defendant Lin responded the following, in relevant part:

We're looking at -- when we mentioned that it's high-single-digit millions of CopperEdge, effectively, you can consider that 200-gig active copper cable, and ***it's really directed -- our customer is cable suppliers, but I think we get the demand really from that large company.*** So at this point, just with the demand for the cables, I don't think, really anything is going into channel. It's really going to supply rack shipments.

77.     The statements in ¶¶72-76 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company was experiencing a reduction in sales for its CopperEdge products as a result of heating issues associated therewith; (2) as a result of the heating issues associated with CopperEdge, NVIDIA stopped purchasing CopperEdge products from Semtech and developed its own new processing unit instead; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants' statements were materially false and misleading and/or lacked a rational basis at all relevant times.

### December 3, 2024 Form 10-Q

78.     On December 3, 2024, the Company filed its quarterly report on Form 10-Q with the SEC for the third quarter of 2024 ended October 27, 2024 ("3Q24") (the "3Q24 10-Q"). The 3Q24 10-Q incorporated by reference the risk factors set forth in Semtech's annual report on Form 10-K filed with the SEC on March 28, 2024 for the fiscal year ended January 28, 2024. In relevant part, it incorporated by reference the following risk factor:

We receive a significant portion of our revenues from a small number of customers and the loss of any one of these customers or failure to collect a receivable from them could adversely affect our business.

Our largest customers have varied from year to year. Historically, we have had significant customers that individually accounted for 10% or more of sales in certain quarters or years or represented 10% or more of net accounts receivables at any given date. Sales to our customers are generally made on open account, subject to credit limits we may impose, and the receivables are subject to the risk of being uncollectible.

We believe that our operating results for the foreseeable future will continue to depend on sales to a relatively small number of customers and end customers. We may not be able to maintain or increase sales to some of our top customers for a variety of reasons, including that our agreements with our customers do not require them to purchase a minimum quantity of our products; some of our customers can stop incorporating our products into their own products with limited notice to us and suffer little or no penalty; and many of our customers have pre-existing or concurrent relationships with our current or potential competitors that may affect the customers' decisions to purchase our products. The loss of a major customer, a reduction in sales to any major customer or our inability to attract new significant customers could seriously impact our revenue and materially and adversely affect our business, financial condition and results of operations.

79.     The statements in ¶78 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company was experiencing a reduction in sales for its CopperEdge products as a result of heating issues associated therewith; (2) as a result of the heating issues associated with CopperEdge, NVIDIA stopped purchasing CopperEdge products from Semtech and developed its own new processing unit instead; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants' statements were materially false and misleading and/or lacked a rational basis at all relevant times. Thus, the statement that "The loss of a major customer, a reduction in sales to any major customer or our inability to attract new significant customers could seriously impact our revenue and materially and adversely affect our business, financial condition and results of operations" because such risk has already materialized by NVIDIA halting its purchases of the Company's CopperEdge products.

## THE TRUTH EMERGES

80.     The truth began to emerge on February 7, 2025 when Robert W. Baird & Co ("Baird") lowered its price target on Company stock from $80 to $60, explaining that there had been a slower-than-expected uptake of the Company's active copper cables, which offer widened reach to provide for high-volume switch-to-server connections. In addition,

Baird noted that it had witnessed muted Active Copper Cable ("ACC") benchmarking activity overall.

81.    On this news, the Company's common stock fell $5.99 per share, from a closing price of $60.50 per share on February 6, 2025 to close at $54.51 per share on February 7, 2025.

82.    The truth fully emerged on February 7, 2025 when the Company filed a current report on Form 8-K with the SEC announcing, *inter alia*, that, for the 2026 fiscal year, net sales from Semtech's CopperEdge products used in active copper cables were "expected to be lower than the Company's previously disclosed floor case estimate of $50 million due to rack architectural changes, with no expected ramp-up over the course of fiscal year 2026." In addition, Semtech disclosed that the "revised estimates are based on recent feedback from a server rack customer and correlated to discussions with end users of the server rack platform." That customer was supposedly NVIDIA.

83.    On this news, the Company's stock price fell $16.91, from a closing price of $54.51 per share on February 7, 2025 to close at $37.60 per share on February 10, 2025.

## DAMAGES TO SEMTECH

84.    As a direct and proximate result of the Individual Defendants' conduct, Semtech has lost and will continue to lose and expend many millions of dollars.

85.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy judgments associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

86.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

87.    Such expenditures will also include costs incurred in any internal

investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

88.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

89.    As a direct and proximate result of the Individual Defendants' conduct, Semtech has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

90.    Plaintiff brings this action derivatively and for the benefit of Semtech to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Semtech, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

91.    Semtech is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

92.    Plaintiff is, and has been at all relevant times, a shareholder of Semtech. Plaintiff will adequately and fairly represent the interests of Semtech in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

93.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

94.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Semtech's Board consisted of the following nine individuals: Defendants

Hou, Li, Burvill, Cardenuto, Fischer, Gillai, LuPriore, Ruehl, and Walsh (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to five of the nine Director-Defendants that were on the Board at the time this action was filed.

95.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

96.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Semtech to issue materially false and misleading statements. Specifically, the Director-Defendants caused Semtech to issue false and misleading statements which were intended to make Semtech appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and demand upon them is futile, and thus excused.

97.    Additional reasons that demand on Defendant Hou is futile to follow. Defendant Hou has served as President and CEO of the Company since June 2024 and as a Company director since July 2023. The Company provides Defendant Hou with his principal occupation, for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. As the Company's trusted CEO, Defendant Hou conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made

many of the false and misleading statements alleged herein. He is also a defendant in the Securities Class Actions. For these reasons, too, Defendant Hou breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

98.    Additional reasons that demand on Defendant Li is futile follow. Defendant Li has served as a Company director since 2016 and as Chair of the Board since 2024. She also serves as Chair of the Nominating and Governance Committee and as a member of the Human Capital and Compensation Committee and the Technology and Strategy Committee. Defendant Li has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Li breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

99.    Additional reasons that demand on Defendant Burvill is futile follow. Defendant Burvill has served as a Company director since October 2020. He also serves as Chair of the Human Capital and Compensation Committee and as a member of the Nominating and Governance Committee. Defendant Burvill has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Burvill breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

Verified Shareholder Derivative Complaint

100. Additional reasons that demand on Defendant Cardenuto is futile follow. Defendant Cardenuto has served as a Company director since September 2018. He also serves as a member of the Audit Committee. Defendant Cardenuto has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Cardenuto breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

101. Additional reasons that demand on Defendant LuPriore is futile follow. Defendant LuPriore has served as a Company director since October 2020. She also serves as a member of the Audit Committee and the Human Capital and Compensation Committee. Defendant LuPriore has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant LuPriore breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

102. Additional reasons that demand on Defendant Fischer is futile follow. Defendant Fischer has served as a Company director since April 2023. He also serves as a member of the Human Capital and Compensation Committee, the Nominating and Governance Committee, and the Technology and Strategy Committee. Defendant Fischer has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause

the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, his insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme. For these reasons, Defendant Fischer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

103.   Additional reasons that demand on Defendant Gillai is futile follow. Defendant Gillai has served as a Company director since September 2018. He also serves as Chair of the Technology and Strategy Committee and as a member of the Human Capital and Compensation Committee and the Nominating and Governance Committee. Defendant Gillai has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Gillai breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

104.   Additional reasons that demand on Defendant Ruehl is futile follow. Defendant Ruehl has served as a Company director since December 2023. She also serves as a member of the Audit Committee. Defendant Ruehl has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Ruehl breached her fiduciary duties,

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

105.    Additional reasons that demand on Defendant Walsh is futile follow. Defendant Walsh has served as a Company director since April 2023. He also serves as Chair of the Audit Committee and as a member of the Nominating and Governance Committee and the Technology and Strategy Committee. Defendant Walsh has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Walsh breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

106.    Additional reasons that demand on the Board is futile follow.

107.    Defendants Walsh, Cardenuto, LuPriore, and Ruehl (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

108.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

109.   Semtech has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Semtech any part of the damages Semtech suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

110.   The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

111.   The acts complained of herein constitute violations of fiduciary duties owed by Semtech's officers and directors, and these acts are incapable of ratification.

112.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Semtech. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Semtech, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

113.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Semtech to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

114.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

115.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

116.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Semtech's business and

affairs.

117.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

118.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Semtech.

119.    In breach of their fiduciary duties owed to Semtech, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company was experiencing a reduction in sales for its CopperEdge products as a result of heating issues associated therewith; (2) as a result of the heating issues associated with CopperEdge, NVIDIA stopped purchasing CopperEdge products from Semtech and developed its own new processing unit instead; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants' statements were materially false and misleading and/or lacked a rational basis at all relevant times.

120.    The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while, at the same time, two of the Individual Defendants made insider sales while in possession of material nonpublic information, netting combined total proceeds of $709,149.

121.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

122.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or

acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Semtech's securities.

123.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Semtech's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

124.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

125.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Semtech has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

126.    Plaintiff, on behalf of Semtech, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Unjust Enrichment

127.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

128.    By their wrongful acts, violations of law, and false and misleading statements

and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Semtech.

129.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Semtech that was tied to the performance or artificially inflated valuation of Semtech or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

130.   Plaintiff, as a shareholder and a representative of Semtech, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

131.   Plaintiff, on behalf of Semtech, has no adequate remedy at law.

### THIRD CLAIM
**Against the Individual Defendants for Abuse of Control**

132.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

133.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Semtech, for which they are legally responsible.

134.   As a direct and proximate result of the Individual Defendants' abuse of control, Semtech has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

135.   Plaintiff, on behalf of Semtech, has no adequate remedy at law.

### FOURTH CLAIM
**Against the Individual Defendants for Gross Mismanagement**

136. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

137. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Semtech in a manner consistent with the operations of a publicly held corporation.

138. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Semtech has sustained and will continue to sustain significant damages.

139. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

140. Plaintiff, on behalf of Semtech, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

141. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

142. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

143. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Semtech to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

144. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

Verified Shareholder Derivative Complaint

145.   Plaintiff, on behalf of Semtech, has no adequate remedy at law.

## SIXTH CLAIM
### Against Defendants Hou and Lin for Contribution Under Sections 10(b) and 21D of the Exchange Act

146.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

147.   Semtech and Defendants Hou and Lin are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Hou's and Defendant Lin's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

148.   Defendants Hou and Lin, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

149.   Accordingly, Defendants Hou and Lin are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

150.   As such, Semtech is entitled to receive all appropriate contribution or indemnification from Defendants Hou and Lin.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Semtech,

and that Plaintiff is an adequate representative of the Company;

        (b)      Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Semtech;

        (c)      Determining and awarding to Semtech the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

        (d)      Directing Semtech and the Individual Defendants to take all necessary actions to reform and improve Semtech's corporate governance and internal procedures to comply with applicable laws and to protect Semtech and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Semtech to nominate at least five candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

        (e)      Awarding Semtech restitution from the Individual Defendants, and each of them;

///

///

///

///

///

Verified Shareholder Derivative Complaint

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

### **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.


Dated: May 9, 2025              Respectfully submitted,

                                **THE BROWN LAW FIRM, P.C.**

                                */s/*Robert C. Moest
                                Robert C. Moest, Of Counsel, SBN 62166
                                2530 Wilshire Boulevard, Second Floor
                                Santa Monica, CA 90403
                                Telephone: (310) 915-6628
                                Facsimile: (310) 915-9897
                                Email: RMoest@aol.com

                                *Attorneys for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

       I, Chad Strapp, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

       I declare under penalty of perjury that the foregoing is true and correct.  Executed this
7 __ day of May, 2025.


Signed by:

FF9A2026FD5444D...

Chad Strapp